**SO ORDERED.**
**SIGNED 8th day of September, 2026**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

**Randal S. Mashburn**
**Chief U.S. Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Bartram Logistics, LLC, d/b/a | ) | Case No. 3:25-bk-03788 |
| Bartram Electric, | ) | Chapter 11 |
| | ) | Judge Randal S. Mashburn |
| Debtor. | ) | |

## MEMORANDUM OPINION

The policies behind allowing administrative expense claims for an operating business in Chapter 11 are critical to giving a debtor in possession a chance to survive. The priority of such claims provides protection to vendors, suppliers, and other parties that are willing to continue to do business with a company in bankruptcy. It is unusual for a serious dispute to arise over allowance of such claims, and those that do arise are typically resolved without court intervention. This case is a clear exception – with the administrative claimant and the Debtor fighting over virtually every factual and legal issue that could surface in connection with a priority claim dispute.

Debtor Bartram Logistics, LLC, d/b/a Bartram Electric, is an electrical subcontractor for large multi-family residential construction projects and hotels, among others. Movant Winsupply HESCO Acq Co. d/b/a HESCO ("HESCO") is one of several electrical material suppliers sub-subcontracting with the Debtor on its projects throughout the Southeastern United States.

The Court was tasked with resolving the Debtor's objections to HESCO's claim for administrative expense priority treatment of several broad categories of invoices:

(i) pre-petition invoices for which HESCO waived its statutory liens post-petition as part of failed debtor in possession financing; (ii) pre-petition invoices for goods delivered in the 20 days preceding the Debtor's bankruptcy filing (§ 503(b)(9) claim); and (iii) post-petition invoices relating to goods delivered post-petition. To complicate matters further, the post-petition invoice category can be broken down into multiple sub-categories with their own separate issues and disputes.

After a three-day trial, and for the reasons explained herein, the Court denies HESCO's claim for administrative expense priority relating to pre-petition invoices and post-petition lien waivers, allows HESCO's § 503(b)(9) claim in nominal part, and allows the majority of HESCO's § 503(b)(1) claim relating to post-petition invoices.

## I. FACTS AND PROCEDURAL HISTORY

The parties' business relationship began in December 2024, when HESCO agreed to supply electrical material to the Debtor on credit terms. With respect to all of the construction projects at issue, the Debtor contracted directly with the general contractors for the projects and sub-subcontracted with HESCO.

### A. Order and Supply History

The Debtor orders standard electrical items kept in stock as well as specially-made products through HESCO, which serves in some instances as the direct supplier and, in other situations, as the authorized distributor for certain manufacturers. Many of the materials the Debtor uses in a construction project are specially made for that project. At the time the Debtor is bidding for a project, the Debtor will work with a manufacturer's broker to obtain drawings of materials that are designed and manufactured according to the architect's and engineer's specifications. The drawings, counts, and prices are included in the Debtor's bid.

HESCO has acted as the supplier for many of the Debtor's projects – sometimes selling products directly and sometimes acting merely as the go-between with the manufacturer. In the latter situation, the manufacturer is relying on the credit of HESCO to ship products, even when the shipment goes directly from the

manufacturer to the Debtor. Purchase orders always go through HESCO, and HESCO invoices the Debtor.

At the time the Debtor ordered materials for a project, it designated a shipping address. The shipping location may be the applicable job site or a HESCO warehouse. HESCO would store material in its warehouse until the Debtor needed it on a job site and requested delivery.

Some of the materials that were made to order had a lengthy lead time from order to manufacture and shipping. The lead time could be several months to a year.

HESCO used a variety of shipping methods when delivering goods from its warehouse, including UPS, Fed-Ex, and other commercial shipping providers for smaller shipments. HESCO shipped the majority of its goods using a third-party shipping company called Southern Reins. HESCO normally communicated with the Debtor about when to expect a delivery, and HESCO and Southern Reins typically would not leave a delivery at a job site unless the Debtor's representative was there to receive it.

HESCO demonstrated through evidence presented at trial that its deliveries were reliable. It delivered materials when it said it would, and any occasional issues with a delivery, such as the wrong material or damaged product, were addressed immediately. Witnesses for both parties agreed that there had been no significant problems during their relationship with products not being delivered when expected.

Unfortunately, HESCO did not track actual delivery dates. Instead, invoice dates typically correlated with a ship date. Manufacturers invoiced HESCO at the time they shipped materials directly to the Debtor, and HESCO in turn invoiced the Debtor. For those materials being shipped directly from a manufacturer to a job site, the shipping method and timing of delivery were not always known and not tracked. HESCO also invoiced the Debtor when it shipped product from its own warehouse. The Debtor likewise had no system that consistently kept track of actual delivery dates.

### B. Billing and Payment History

Debtor's Credit Application and HESCO's General Terms and Conditions in effect at the time of sale governed the parties' transactions. (Exs. 2033 and 2032.)[1] HESCO gave the Debtor 60-day payment terms from date of invoice.

Notwithstanding the 60-day payment terms, it was generally understood by both parties that typical construction billing would apply, and, timing-wise, HESCO would normally be paid when the Debtor was paid. So, contractually, the Debtor had credit terms that would not extend beyond 60 days, but payments sometimes were made later than that if the contractors or owners were slow in paying the Debtor. The Debtor compiled billing invoices from its sub-subcontactors on a monthly basis along with its own billing and sent it to the applicable general contractor. General contractors normally paid within the 60-to-90-day range, either through direct payment to the Debtor, who would then be expected to pass on payment to HESCO, or through joint checks written to the Debtor and HESCO.[2] Because of varying circumstances with specific projects, contractors, or owners, the time of payment could vary significantly and extend beyond 90 days.

In connection with the Debtor's monthly billing, HESCO would sign conditional lien waivers that were contingent on payment of the monthly bills. The lien waiver would include an amount owed and state something to the effect of the lien being waived upon receipt of payment of that amount. The lien waivers also included a date and would only apply to material supplied as of that date. The

---

[1] Exhibit references in the trial transcript and on the exhibit documents themselves may be confusing to those not familiar with this Court's exhibit numbering practices. One-thousand-level exhibit numbers were assigned to each party for pre-marking exhibits. For this matter, HESCO's exhibits were assigned numbers beginning with 2001 and continuing sequentially. The Debtor's exhibits were assigned numbers beginning with 3001 and continuing sequentially. Some confusion may arise because many of HESCO's exhibits also contain the Bates number that HESCO assigned to the documents when responding to the Debtor's discovery requests. For example, Trial Exhibit 2032 is Bates numbered "HESCO 002588 – HESCO 002589."

[2] Sometimes the joint check payments included additional endorsers, such as a check from the project owner might have been written to the general contractor, the Debtor, and HESCO.

conditional lien waivers were intended to assure project owners and general contractors that HESCO had been paid for all prior invoices and HESCO waived the right to file a lien other than as conditioned. Upon receipt of payment, HESCO would sign an unconditional waiver and release of lien.

HESCO's Credit Manager, Lynne Allen, testified that HESCO never waived lien rights when payment was still due unless the waiver was conditioned on payment of the outstanding amount.

**C. Bartram's Bankruptcy and Proposed Post-Petition Financing**

The Debtor filed its chapter 11 petition on September 9, 2025.

A few weeks after filing, the Debtor's President, Jacob ("Jake") Bartram, approached Michael Anderson, HESCO's outside sale representative assigned to the Bartram account, about a proposal that would free up funds for the Debtor's operations that would otherwise go to HESCO. Mr. Anderson took the idea to Lynne Allen, HESCO's Credit Manager, and Robby Brown, HESCO's President. HESCO was receptive to the idea, and HESCO took the necessary steps internally to move forward with the proposed deal.

The idea was for HESCO to waive its liens as to identified pre-petition invoices. When the general contractor paid the Debtor for those invoices, instead of immediately paying HESCO, the Debtor would have use of the funds and the Debtor would pay HESCO according to the terms of a promissory note. As described by HESCO, the concept was to convert short-term, pre-petition accounts receivable into a long-term promissory note.

HESCO knew that the Debtor was in bankruptcy at the time of these discussions, and HESCO sought and obtained the advice of counsel before agreeing to the proposal.

In early October, the Debtor sent HESCO a list of prepetition invoices totaling $992,835.66 and requested that HESCO execute lien waivers. It was intended that the identified invoices would be included in the future promissory note. HESCO

signed and returned the lien waivers as requested. At that point, the terms of the promissory note had not yet been fully negotiated between the parties and their respective counsel, no formal documentation was in place, and certainly no Court approval had been sought or obtained.

HESCO's counsel sent Bartram and its counsel a draft promissory note on October 27, 2025. From late October through early December 2025, the parties exchanged drafts of the promissory note. In addition to typical promissory note terms, HESCO requested special terms, such as that promissory note payments not be subject to disgorgement or offset, that preference claims under 11 U.S.C. § 547 be waived by the Debtor, that HESCO have a super-priority administrative claim for the promissory note debt pursuant to § 364(c)(1), and that HESCO be granted an allowed administrative expense prospectively for goods provided post-petition.

It was always understood by the parties that the note would be subject to bankruptcy court approval, and HESCO's counsel requested and was provided an opportunity to review and approve the Debtor's motion and proposed order prior to filing. On December 2, 2025, HESCO's counsel communicated a sense of urgency that the note transaction be approved by December 10, or otherwise HESCO would need to begin filing liens and affidavits of nonpayment, presumably to revive the liens it had released.

On December 3, 2025, the Debtor filed its Motion Authorizing Debtor to Obtain Post-Petition Financing on a Super-Priority Basis and sought expedited consideration with a hearing on December 10, 2026. ("DIP-Financing Motion"; Ex. 3003, ECF No. 126; ECF No. 127.) The maximum amount of the note and the proposed financing amount was $979,207.98, which was the prepetition debt for which HESCO had executed lien waivers. The Debtor noted in its motion that "[t]he Note does not result in the Debtor incurring any new debt. Rather, it reflects more favorable repayment terms for debt that already existed and was secured on the petition date." (Ex. 3003, Doc. No. 126, ¶ 16.) The proposed repayment terms were

13 equal monthly installments beginning February 15, 2026, and ending March 15, 2027, with 7% interest.

The Court scheduled the hearing, as requested, on December 10, 2025. Multiple parties objected to the proposed financing. The U.S. Trustee objected to, among other things, the proposed waiver of preference claims, a term that HESCO had insisted on. Creditors Studio Bank, GCM Prime, and Fusion Funding also objected for multiple reasons, including: that the proposed loan was a recharacterization of an existing creditor's pre-petition debt; that HESCO would not advance new money to the Debtor but, instead, would simply let Debtor retain project payments when received; and that without proving the validity and enforceability of lien rights, HESCO was getting the benefit of being made whole with super-priority status over other creditors, regardless of whether any of the amounts included in the promissory note are paid to the Debtor. The December 10 hearing was continued to December 30 at the request of the parties.

In the face of the objections and delay in obtaining court approval, HESCO withdrew from the promissory note arrangement on December 16, 2025, stating in a communication between counsel that it was no longer willing to proceed. The Debtor filed a "Notice of Withdrawal" of its motion on December 17, 2025, "based on the proposed lender's unwillingness to proceed with the post-petition financing." (Doc. No. 159.)

**D. The Debtor's Chapter 11 Plan and HESCO's Administrative Expense Claim**

The Debtor filed a Chapter 11 Plan of Reorganization on April 3, 2026, and filed an Amended version on May 11, 2026 (the "Plan"; Doc. Nos. 301, 330). The Plan was initially scheduled for a confirmation hearing on June 16, 2026. On June 10, HESCO and several other creditors filed objections. HESCO objected to the Plan for several reasons, including that the Debtor failed to provide for payment of HESCO's administrative expense claim, which it claimed to exceed $2.24 million at that time,

and that the Debtor's financials showed that the Debtor could not pay an administrative expense claim of that size on the Plan's effective date. (Doc. No. 361.)

The Debtor filed a Second Amended Plan on June 14, 2026, but did not make any changes to address HESCO's objection related to its asserted administrative expense claim. Due to the number and significance of the objections and one creditor's motion to continue the hearing, the Court postponed the June 16 hearing and scheduled the first of several status and scheduling conferences related to Plan confirmation on June 23, 2026. It was intended that the Debtor advise the Court and interested parties about the status of its negotiations with creditors to resolve the objections and for the Court to set an appropriate schedule for a future confirmation hearing. The Court conducted five status conferences on a weekly basis from June 23 to July 23, 2026, and HESCO's counsel was an active participant at most if not all. Based on discussion at the July 23 conference, the Court set new deadlines related to Plan confirmation and a hearing on September 10, 2026. The order included a deadline of August 20 for the Debtor to report the anticipated outcome and effect of the August 13 hearing on HESCO's administrative expense claim and to amend its Plan.

The Debtor gradually resolved most confirmation objections during the weeks between status conferences, but it appeared that no progress was being made regarding the HESCO issues. From the beginning, the Court noted that HESCO's administrative expense claim was a significant factual issue that would need to be resolved with an evidentiary hearing at or prior to the confirmation hearing. The size of the asserted priority claim potentially created a significant impediment to confirmation.

At the status conference on July 16, 2026, HESCO and the Debtor agreed upon a schedule for the Court to hear and determine claim allowance. At that time, HESCO had not yet filed a motion for allowance and payment of an administrative expense claim, despite its awareness that its sizeable claim was contested. It had only filed a standard proof of claim and asserted in its objection to the Plan that more

than $2.24 million was entitled to administrative expense priority. The parties agreed that HESCO would file its motion by July 23, the Debtor would respond by July 30, and the Court would conduct a hearing on August 13, 2026. These dates were incorporated into a scheduling order entered on July 23. (Doc. No. 407.) HESCO's claim filing deadline was subsequently extended by a few days, with HESCO filing its Motion and Application … for Allowance and Payment of Administrative Claims Pursuant to 11 U.S.C. §§ 503(b)(1)(A), 503(b)(9), and 507(a)(2) and for Other Relief on July 28, 2026. ("HESCO's Administrative Expense Claim"; Doc. No. 415.)

This schedule is relevant to highlight that HESCO's administrative expense claim was disputed and at issue for at least six weeks before the August 13 hearing was scheduled and nine weeks before the hearing itself. Although the hearing was scheduled to occur on a relatively fast track, both parties were aware for at least two months that an evidentiary hearing on HESCO's claim would be needed in connection with Plan confirmation.[3] Neither party requested that the Court shorten any of the standard deadlines for conducting discovery, but both parties sought to compel expedited discovery. The schedule was later adjusted to allow some filings to be delayed, but, by agreement of the parties, it remained on track to have an evidentiary hearing on a somewhat expedited basis to assure that a ruling could be obtained well enough in advance of the September 10, 2026, confirmation hearing to not necessitate delay. Some minor issues arose over timeliness of discovery responses and exchange of documents, but counsel proceeded with the August 13, 2026, start date for the evidentiary hearing.

The Court conducted an evidentiary hearing on August 13 and 14, 2026, and reconvened on August 19, 2026, for closing arguments. In addition to the documents

[3] No chastisement of counsel is intended. This is a document-heavy claim, and it was the Court's impression at trial that both parties and counsel had worked reasonably diligently and cooperatively to prepare for trial. Additionally, the hope of negotiating a resolution may have influenced discovery decisions early on. However, in light of the advance notice and counsels' agreement to the fast track for hearing, any arguments about lack of discovery, prejudice, or surprise are not convincing.

entered into evidence at trial, each party presented demonstrative exhibits during closing arguments. The Debtor's demonstrative exhibits were attached as Exhibits A – H to its post-hearing brief. (Doc. No. 467.). HESCO's demonstrative exhibits were uploaded into the Court's electronic evidence program, assigned exhibit numbers 2043 – 2053, and "admitted" solely as demonstrative exhibit summaries of evidence otherwise presented at trial. (The Court notes that the tracking information in Exhibit 2046 was derived from information that was compiled solely for litigation purposes, and Exhibit 2025 that included a column with those numbers was admitted with certain caveats. Regardless, the tracking numbers by themselves do not reflect actual delivery dates.)

HESCO also filed a brief after closing arguments (Doc. No. 483), to which the Debtor responded (Doc. No. 484). HESCO included arguments and compilations of trial evidence, which the Court considered. The Court appreciates the efforts of both parties in assisting the Court with performing various calculations based on the voluminous documentary evidence.

HESCO also requested in its post-hearing brief and in a subsequent motion that the Court take judicial notice of evidence of the tracking numbers and related web searches HESCO would have the Court perform and of the Debtor's monthly operating reports. Since HESCO is offering this additional evidence after the close of HESCO's proof on August 14, the Court has not considered it. All of the evidence was available to HESCO prior to trial, and HESCO has not presented any satisfactory justification to supplement the record.[4]

## II. ADMINISTRATIVE EXPENSE CLAIMS GENERALLY

Administrative expense claims are given priority over prepetition unsecured claims. *Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835, 837–38 (6th Cir.

[4] This is more fully addressed in the portion of the opinion dealing with the § 503(b)(9) claim and in the Court's separate order ruling on HESCO's evidentiary motion.

2010) (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5, 120 S. Ct. 1942, 147 L.Ed.2d 1 (2000) (citations omitted)). "The purpose of [this priority] is to facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services." *Id.* at 838 (quoting *United Trucking Serv., Inc. v. Trailer Rental Co.* (*In re United Trucking Serv., Inc.*), 851 F.2d 159, 161 (6th Cir. 1988)).

"[B]ecause priority claims reduce the funds available for creditors and other claimants," courts closely scrutinize administrative expense claims. *City of White Plains, N.Y. v. A & S Galleria Real Estate, Inc.* (*In re Federated Dept. Stores, Inc.*), 270 F.3d 994, 1000 (6th Cir. 2001).

As the claimant, HESCO has the burden of proving that its claim constitutes an administrative expense. *Nat'l Union Fire Ins. Co.*, 606 F.3d at 38. The requisite burden of proof is preponderance of the evidence. *In re Blankenship*, 610 B.R. 831, 840 (Bankr. W.D. Tenn. 2019).

HESCO asserts administrative expense claims under 11 U.S.C. §§ 503(b)(1)(A) and 503(b)(9).

## III. § 503(b)(9) CLAIM

The Bankruptcy Code allows administrative expense priority for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). This may be broken into three elements: "(1) goods were sold; (2) the goods must have been received by the debtor within 20 days prior to the commencement of the bankruptcy case; and (3) the goods must have been sold in the ordinary course of business." *In re Arts Dairy, LLC*, 414 B.R. 219, 220–21 (Bankr. N.D. Ohio 2009) (citation omitted).

HESCO claims to have delivered goods valued at $92,591.20 in the 20 days preceding the petition filing date, September 9, 2025, for which it has not been paid.

(Ex. 2022, HESCO 02082-02083; Ex. 2024, HESCO 02117-02118.) HESCO included in that number all unpaid invoices dated August 20 – September 8, 2025. That the invoices relate to "ordinary course of business" transactions is not disputed. That all invoices relate to "goods" and that the goods were received in the 20-day prepetition period are disputed facts.

"Goods" is not defined in the Bankruptcy Code, so courts turn to the Uniform Commercial Code definition. *In re Plastech Eng'd Prods., Inc.*, 397 B.R. 828, 835-36 (Bankr. E.D. Mich. 2008). Under Georgia's Uniform Commercial Code – Sales,[5] "goods" is defined in applicable part as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8 of this title), and things in action." Ga. Code Ann. § 11-2-105(1). HESCO included in its claim an invoice for "added services from SESCO" with a charge of $1,887.70. (Ex. 2015, HESCO 00432.)

A HESCO witness testified that this expense related to services billed by the manufacturers' broker, SESCO, for compiling and preparing an electronic book of products, including related drawings and specifications, that Bartram ordered for a particular job. SESCO was not selling the project materials book. It passed on an administrative expense related to it. Therefore, that element of the invoice that expressly refers to this item as a "service" does not relate to the sale of a "good."

Even if the $1,887.70 charge could be construed as a "good," HESCO's 503(b)(9) claim related to the invoice suffers from the same timing of delivery issue as the bulk of HESCO's claim. So the outcome as it relates to this particular charge would be the same regardless of the "goods" definitional issue.

Moving to the most critical element of § 503(b)(9) for purposes of this case, HESCO may be entitled to priority treatment for most its claim under that subsection

---

[5] HESCO's General Terms and Conditions state that Georgia law applies. (Ex. 2032.)

if it can prove the Debtor received the invoiced goods within the 20-day period. And that is a problem for HESCO.

While HESCO proved itself to be generally reliable in delivering the materials it said it would deliver, HESCO presented very little admissible proof of the timing of its deliveries during the 20 days preceding its bankruptcy filing, which is crucial for a § 503(b)(9) claim.

As proof of delivery in that timeframe, HESCO offered testimony that its invoice date closely correlated with ship date, as well as proof of its general reliability with respect to delivering the materials it shipped. However, this proof is not sufficient for § 503(b)(9) purposes since proof of receipt by the Debtor within the 20-day period is an essential element of the claim. Additionally, goods were not shipped to the Debtor in a uniform manner with uniform timing of delivery.

The majority of the invoices are designated "Direct" ship. These are for goods shipped directly from the manufacturer. The admissible proof provided no indication of where the goods originated (*i.e.*, manufacturers were located throughout the U.S., Canada, and Mexico) or how they were shipped. For some of these invoices, HESCO provided spreadsheets with shipping information added for the purpose of litigation, including Fed-Ex and other shippers' tracking numbers. However, the tracking information, even to the extent it can be construed as having been fully admitted despite limitations noted during the trial, does not reflect actual delivery dates. More importantly, while the tracking numbers might *lead* to proof of delivery, that proof itself was not entered into evidence at trial.

Even if the Court had admitted the demonstrative exhibit created for trial purposes as an actual exhibit that proved the truth of the matter asserted, it only showed the identity of the shipper and the tracking number, not the actual delivery date. After proof had closed on August 14, 2026, counsel for HESCO argued that the Court should consider information that could be retrieved from the respective shipping companies' websites using the tracking numbers to prove delivery dates. The Court refused to accept evidence of this type after proof had closed and in the

middle of closing arguments, especially since it had been readily available to HESCO in advance and there was no justification for not presenting it in a timely manner – not to mention that there were potential admissibility issues with this type of evidence. HESCO belatedly filed a formal motion to admit this evidence two weeks after the conclusion of the trial, and that motion has been denied.

Other than the following three exceptions, HESCO did not provide proof that it delivered the invoiced goods to the Debtor within the 20-day period.

Two of the invoices for which HESCO did provide proof of delivery relate to goods that were delivered to the intended location but were not received by the Debtor. The Debtor ordered the goods for a project at Johnson State Prison in Wrightsville, Georgia, for which it was initially selected but subsequently terminated before beginning work on site. The Debtor's approval for the work was withdrawn due to the Debtor not meeting the requirements for governmental work in Georgia. HESCO delivered goods valued at $2,287.47 to Johnson State Prison during the 20-day period, but they were not received by the Debtor as the Debtor was no longer the electrical contractor for that job. The recipient would have been the general contractor or the replacement electrical subcontractor. On this point, HESCO argued in its post-hearing brief that evidence exists to show that the Debtor received a payment related to the Johnson State Prison, which contradicts the Debtor's contention that it never did work on the Johnson State Prison project. That payment evidence was not admitted at trial and is not in the record. Even if it were in the record, it does not serve to contradict the testimony of Debtor's witnesses which was that the Debtor performed preliminary work (*e.g.*, at the very least, the Debtor determined what materials were needed and ordered them from HESCO), but it did not perform work on site and it did not have people deployed to the job site at the time HESCO's materials were delivered.

The only other invoice for which HESCO provided sufficient proof of delivery and receipt by the Debtor in the 20-day period is for goods valued at $141.91. The invoice for those goods is dated August 29, 2025, and states that the shipping method

was "UPS Next Day Air." HESCO's witness testified that it shipped goods contemporaneously with the issuance of an invoice. We can reasonably expect that goods shipped "next day air" on or about August 29 were delivered well before September 9. The Court accepts the invoice as proof of delivery and receipt by the Debtor within the 20-day period.[6]

HESCO is granted an administrative expense claim under § 503(b)(9) for $141.91. The remainder of its claim is denied.

## IV. § 503(b)(1)(A) CLAIMS

Another category of administrative expense is "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). The Sixth Circuit applies a two-part "benefit to the estate" test to determine whether a claim is entitled to administrative expense priority under § 503(b)(1)(A). *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 225–26 (6th Cir. 2009); *In re HNRC Dissolution Co.*, 396 B.R. 461, 475 (B.A.P. 6th Cir. 2008).

"A debt qualifies as an 'actual, necessary' administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *Nat'l Union Fire Ins. Co.*, 606 F.3d at 838 (quoting *In re Eagle–Picher Industries, Inc.*, 447 F.3d 461, 464 (6th Cir. 2006) (quoting *Pension Benefit Guar. Corp. v. Sunarhauserman, Inc.* (*In re Sunarhauserman, Inc.*), 126 F.3d 811, 816 (6th Cir. 1997)) (cleaned up).

To be entitled to administrative expense priority, a debt must arise post-petition, *i.e.*, after the debtor files for bankruptcy. *McMillan*, 555 F.3d at 226 (citations omitted). The expense must arise from a transaction that occurred post-

[6] This evidence is distinguishable from the bare tracking numbers discussed *supra*, which may indicate the shipper, but do not indicate the method of shipment.

petition between the claimant and the bankruptcy estate, or in this case, the debtor in possession. *In re Eagle-Picher Indus.,* 447 F.3d at 464 (citation omitted).

"In order to determine when a transaction occurred pre-petition or post-petition, the focus is on, '… when the acts giving rise to a liability took place, not when they accrued.'" *BK Novi Project LLC v. Stevenson* (*In re Baby N'Kids Bedrooms, Inc.*), No. 07-1606, 2008 WL 9836333, at *2 (6th Cir. Mar. 26, 2008) (quoting *Sunarhauserman*, 126 F.3d at 818).

Another way of looking at it is whether the claimant gave consideration to the debtor in possession at the debtor in possession's inducement.

> A creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession. *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984). However, if the inducement came from the debtor-in-possession, then the claims of the creditor are given priority. *Id.* at 586.

*Emp. Transfer Corp. v. Grigsby* (*In re White Motor Corp.*), 831 F.2d 106, 110 (6th Cir. 1987). If the services provided post-petition "arise from commitments made before the debtor-in-possession came into existence," they are not entitled to administrative expense priority. *Id.*; *see also In re Gasel Transp. Lines, Inc.*, 326 B.R. 683, 687 (B.A.P. 6th Cir. 2005) ("In determining whether there was a 'transaction with the bankruptcy estate,' 'the proper focus [is] on the inducement involved in causing the creditor to part with its goods or services.'") (quoting *United Trucking Serv.*, 851 F.2d at 162)).

HESCO claims administrative expenses relating to (i) goods delivered post-petition and (ii) HESCO's post-petition lien waivers.

### A. Claim Relating to Goods Delivered Post-Petition

HESCO initially asserted an administrative expense claim for goods delivered after the petition date in the amount of $686,470.40. Prior to trial, HESCO reduced its claim to $562,318.09, reflecting receipt of payment on some invoices.[7]

The Debtor does not dispute that HESCO delivered the goods after the petition date.[8] Instead, the Debtor raises several other objections: (i) that any goods delivered from third-parties post-petition based on pre-petition purchase orders do not relate to transactions with the debtor in possession and bankruptcy estate; (ii) that any invoices for goods on rejected projects, whether delivered before or after HESCO received notice of rejection, did not benefit the estate; and (iii) that invoices relating to projects the Debtor completed should not be allowed as an administrative expense for the full value of the invoice.

#### 1. Goods from Denied § 503(b)(9) Claim

HESCO argues that any invoices excluded from its § 503(b)(9) claim for inadequate proof of delivery during the 20 days preceding the petition date should be considered in HESCO's § 503(b)(1) claim. HESCO argues that delivery necessarily would have been made after the invoice dates, since HESCO invoiced at or soon after shipment. Its position is that if the goods were not received within the 20-day period, they would have been received after the petition date.

HESCO's argument fails because, as it relates to these goods shipped before the petition date, HESCO's transaction was with the pre-petition debtor, not the

---

[7] Curiously, neither party explained why HESCO's lien rights have not ensured payment of its post-petition invoices from third party general contractors and owners. Whether HESCO did or did not perfect its lien rights related to post-petition deliveries was not disclosed. However, HESCO has admitted to continuing to receive payment on some invoices as shown by the reduction of its claim.

[8] The Debtor argued in its briefs that to the extent HESCO was claiming an administrative expense related to goods that remained in HESCO's warehouse, those goods were never received by the Debtor and cannot have benefited the estate. The proof at trial was that all goods included in HESCO's claim were shipped and delivered by HESCO from its warehouse or by manufacturers directly. HESCO's counsel denied that its claim included any goods still stored in its warehouse, and the testimony of HESCO's witnesses bore this out. Furthermore, the Debtor did not identify any invoice to which its argument applied. The Debtor's argument need not be addressed based on the proof at trial.

bankruptcy estate. They fail the first factor of the test for administrative claim treatment under § 503(b)(1).

### 2. Goods from Pre-Petition Purchase Orders Shipped Post-Petition by Manufacturer

The Debtor ordered substantially all of the materials it needed to complete a project at the beginning of the project. Therefore, orders could be placed months or even a year before the materials would be needed. When the materials were shipped to HESCO's warehouse to be stored until the Debtor needed them on the job site, the Debtor communicated with HESCO after the petition date to request that the materials be delivered. As it relates to the invoices in HESCO's administrative expense claim, HESCO delivered the materials upon request and invoiced the Debtor. The Debtor essentially conceded that these post-petition communications with HESCO requesting delivery of goods stored in its warehouse amount to a transaction with the bankruptcy estate.

The Debtor then distinguishes goods that were delivered from third-party manufacturers directly to job sites. These invoices total $157,564.52. Between the purchase orders placed before the petition date to shipment from third party manufacturers and delivery after the petition date, the Debtor normally would not have communicated with HESCO or the manufacturers about the orders. The manufacturers shipped when the materials were manufactured and invoiced HESCO at the time of shipment. HESCO then invoiced the Debtor. The Debtor argues that there is no transaction with the bankruptcy estate relating to these goods. The Court disagrees.

The Debtor's position relies on a false premise – that the direct shipped goods reflected transactions between the manufacturers and the Debtor and not with HESCO. However, all of these transactions involved transactions between HESCO and the Debtor, and the source of the shipment is not particularly relevant to the analysis. The manufacturers never invoiced the Debtor, but rather the financial transaction was between HESCO and the Debtor. HESCO invoiced the Debtor for

every shipment regardless of whether the products were shipped directly by the manufacturer to a job site or to a HESCO warehouse. At any time, HESCO could have pulled the plug on the shipments, even if they were coming directly from the manufacturer.

The invoices relate to jobs that the Debtor continued working after the petition date, with the shortest period of post-petition work being at least three months until the Debtor abandoned some projects in mid-late-December. Other projects were completed, and still others are ongoing. The bankruptcy estate was not a passive recipient of goods ordered before the petition date. The Debtor continued to work with HESCO as its material supplier on the projects after the petition date and communicated with HESCO frequently and regularly about the continued supply of materials. Had the Debtor not communicated its desire to continue to receive the materials it ordered prior to the petition date, HESCO may have cut off the supply and stopped shipments.

The Court finds that the Debtor's communications with HESCO about the continued supply of goods after the petition date created a "transaction" with the bankruptcy estate for the purposes of § 503(b)(1) that included both the goods in HESCO's warehouse that the debtor in possession specifically requested be delivered and the goods being delivered by third-party manufacturers about which there may not have been a specific communication.

### 3. Abandoned Jobs / Rejected Contracts

The Debtor abandoned several jobs and rejected its subcontracts in December 2025. Substantially contemporaneously with the dates of abandonment, the Debtor filed two motions to reject the subcontracts. The Debtor raises two issues related to the abandoned projects: (i) HESCO continued delivering materials after HESCO had notice of the Debtor's abandonment by virtue of the motions to reject; and (ii) the Debtor argues that it was not paid for any of the post-petition/pre-abandonment materials, thus HESCO cannot prove that the materials benefited the estate.

HESCO calculated that $158,173.23 of its claim relates to materials delivered to abandoned job sites after the Debtor filed its motions to reject.[9] The Debtor would not have received or used these materials and the estate would not have benefited. Excluding these post-rejection invoices brings HESCO's claim relating to goods delivered post-petition down to $404,144.86.

After abandonment, the general contractors stopped paying Bartram. The payments that it had received after the petition date and prior to abandonment were on account of pre-petition billings and thus pre-petition HESCO invoices. Because the Debtor was not paid for any materials HESCO delivered after the petition date on the abandoned projects, the Debtor argues that the materials did not provide a direct and substantial benefit to the estate.

HESCO argues that if it had not continued to supply these projects so that the Debtor could work the projects for three months after the petition date, the Debtor would not have been paid even the payments for pre-petition work and materials that were paid after the petition date.

Neither party has presented any evidence of particular materials that were not used by the Debtor but were left behind for the general contractor or other electrical subcontractor to use. The Debtor did not take note of any unused materials when it walked off the projects. The only evidence the Court has is that the Debtor generally had use of the materials during the three months that the Debtor continued to work on the projects. Additionally, the Debtor typically did not have storage at job sites, so it generally requested delivery of materials from HESCO's warehouse when the Debtor was ready to use them.

The Debtor received and used the materials in the ordinary course of its business after the petition date. The benefit was in the Debtor's use of the materials in furtherance of its business, and there is no compelling reason to measure the benefit based on whether a third-party general contractor or project owner has paid

[9] Debtor's calculation was substantially similar.

the Debtor. The Debtor's unilateral decision to walk off the job site and essentially forfeit further payment should not negate the benefit to the estate provided by HESCO's materials.

Furthermore, contractually, the Debtor's obligation to pay HESCO does not depend on the Debtor being paid by general contractors or owners. The Terms and Conditions applicable to all HESCO orders provide:

> 2.4 Unless otherwise agreed by HESCO in writing, retainage shall not apply and Buyer shall not hold back any retainage from HESCO even if retainage is part of any contract between Buyer and any other person. *Payment is not contingent upon Buyer's collection of funds from any other person.*

(Ex. 2032.)

#### 4. Completed Projects

The Debtor distinguishes abandoned jobs from completed jobs. The Debtor has received payments for post-petition work and materials on completed projects, but it has not been paid in full. It argues that HESCO's provision of materials on these projects provided it some benefit, but not the full amount of HESCO's invoices. As stated above, the Court finds no basis for measuring the benefit to the estate provided by HESCO's materials based on whether the Debtor has been paid.

#### 5. Conclusion: Allowed Claim for Materials Delivered Post-Petition

HESCO is entitled to an administrative expense claim for the full value of materials that HESCO sold, shipped and delivered – or allowed to be shipped and delivered from manufacturers based on the Debtor's requests for continued supply and flow of material – to the Debtor after the petition date, and that the Debtor used in the ordinary course of its business. The amount of this portion of HESCO's allowed claim is $404,144.86.

### B. Claim Relating to Prepetition Debt / Post-Petition Lien Waivers

HESCO asserts that it is entitled to an administrative expense claim in the amount of $1,145,921.07 based on its post-petition waiver of liens relating to pre-petition invoices. HESCO arrived at its claim amount by totaling all unpaid invoices from the start of the parties' relationship through August 19, 2025 (*i.e.*, all pre-petition invoices excluding those dated during the 503(b)(9) period of August 20 – September 8, 2025). (Ex. 2023.) The claim amount does not correlate to invoices intentionally included in lien waivers and expected to be included in the never-approved promissory note. That amount is $979,207.98. HESCO offers no justification to include an additional $166,713.09 in extraneous pre-petition invoices in its lien waiver claim.

To satisfy the test for administrative expense priority under § 503(b)(1)(A), the expense must relate to a post-petition transaction with the debtor in possession. The Debtor and HESCO agreed to the specific invoices that would be included in the lien waivers and incorporated into a post-petition promissory note. Those invoices totaled $979,207.98. To the extent there is any "transaction" with the bankruptcy estate related to lien waivers, it was capped at $979,207.98.

#### 1. Unapproved, Non-Ordinary Course Transaction

To be entitled to an administrative expense, it must arise from a transaction that occurred post-petition between the claimant and the bankruptcy estate. *Eagle-Picher Indus., Inc.*, 447 F.3d at 464. It is undisputed that all of the invoices included in HESCO's lien waiver claim relate to goods ordered and delivered pre-petition. The idea of HESCO waiving its liens and converting the Debtor's invoiced, short-term debt to longer term promissory note debt arose post-petition and was initiated by the Debtor.

The Bankruptcy Code dedicates a section to the process for a debtor in possession to incur unsecured debt. 11 U.S.C. § 364. If the debt is incurred in the ordinary course of business, it may be entitled to administrative expense priority

under § 503(b)(1). § 364(a). However, if the debt is incurred outside the ordinary course of business, the unsecured debt transaction is subject to court approval, after notice and a hearing, for it to be allowed as an administrative expense under § 503(b)(1). § 364(b); *see also In re Nilhan Devs., LLC*, 620 B.R. 385, 400 (Bankr. N.D. Ga. 2020), aff'd, No. 1:20-CV-3491-RWS, 2021 WL 4516367 (N.D. Ga. Sept. 30, 2021), aff'd, No. 21-13820, 2022 WL 3275175 (11th Cir. Aug. 11, 2022).

It is not and cannot be disputed that the proposed lien waiver/promissory note transaction was outside the ordinary course for both parties. HESCO supplied goods to the Debtor on 60-day credit terms. HESCO did not ordinarily convert short-term debt to a long-term promissory note, and HESCO's Credit Manager testified that HESCO never released its lien rights until it was paid or else it conditioned release on payment. The proposed transaction was unprecedented in the parties' relationship. For that matter, it was unprecedented in any relationship between HESCO and any of its customers. It was in the nature of post-petition, unsecured, non-ordinary course financing which unquestionably required approval by the bankruptcy court.

The parties sought court approval in good faith, but HESCO withdrew from the deal prior to approval being obtained which necessitated the Debtor withdrawing its motion.

HESCO acknowledges that the promissory note, with all its terms (*e.g.*, waiver of preference claims, super-priority administrative expense, etc.), was not approved by the Court. The Debtor argues that HESCO is effectively seeking retroactive approval of post-petition financing, which is problematic based on the Supreme Court's admonition against *nunc pro tunc* rulings in *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 589 U.S. 57, 65, 140 S. Ct. 696, 701, 206 L. Ed. 2d 1 (2020), and based on a strict test for retroactive approval of post-petition financing in particular.

HESCO responds that it is not seeking retroactive approval *per se*. It argues that, notwithstanding the nature of its claim being unapproved post-petition

financing, it still qualifies for administrative expense treatment under the Sixth Circuit's "benefit to the estate" test or as an unjust enrichment to the estate. HESCO cited no cases involving parties seeking administrative expense treatment related to unapproved post-petition financing.

### 2. *Nunc Pro Tunc* Approval is Not Warranted

HESCO has not expressly sought *nunc pro tunc* approval of the lien waiver transaction. However, it is essentially doing so by seeking administrative expense treatment notwithstanding the lack of prior approval.

The Supreme Court has ruled that *nunc pro tunc* orders, or "now for then orders," are only appropriate to reflect events that actually happened and should not be used to revise history. *Acevedo*, 589 U.S. at 65, *cited in In re Nilhan Devs.*, 620 B.R. at 403.

Here, the parties withdrew the Debtor's DIP Financing Motion when it drew strong opposition from the U.S. Trustee and several creditors. To approve an administrative expense for the full amount of the proposed promissory note would be an end run around § 364(b), which the Court is unwilling to do.

Prior to and after *Acevedo*, some courts approved post-petition financing retroactively in exceptional circumstances. *In re Nilhan Devs., LLC*, 620 B.R. at 403; *see also Gen'l Elec. Cap. Corp. v. Hoerner* (*In re Grand Valley Sport & Marine, Inc.*) 143 B.R. 840, 850 (Bankr. W.D. Mich. 1992) ("*Nunc pro tunc* approval of postpetition financing is limited to 'extraordinary' or 'unusual' circumstances."). Retroactive approval was considered to be within the equitable power of a bankruptcy court and discretionary. *Id.*

The Supreme Court in *Law v. Siegel*, limited the court's ability to use its general equitable powers under § 105(a) "to override explicit mandates of other sections of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421, 134 S. Ct. 1188, 188 L. Ed. 2d 146 (2014), *quoted in In re Nilhan Devs.,* 620 B.R. at 403. The Code requires that post-petition financing be approved, but much like the employment of

counsel, the Code does not expressly state that approval be prior to the provision of any credit. *See, e.g., In re Roberts*, 618 B.R. 213, 217-18 (Bankr. S.D. Ohio 2020) (noting that the unavailability of *nunc pro tunc* approval after *Acevedo* was immaterial because, although a professional must be approved by the court in order to be compensated, neither the Sixth Circuit, the Code, nor the Rules require that the approval be effective prior to the performance of any services in order for any pre-approval services to be compensated).

Therefore, perhaps it is possible to justify approval of financing after credit is given in certain circumstances. However, doing so in the context of a motion for approval of administrative expense claim when approval of financing under § 364(b) was not fully pursued and there has not been compliance with the notice provisions of Bankruptcy Rule 4001(c) is highly questionable. This is especially true when a § 364(b) motion was filed, Rule 4001(c) notice was provided, and creditors strenuously objected, prompting withdrawal of the motion. To the extent it could ever be appropriate to rationalize approval of a post-petition financing after the transaction is already done, the facts of this case do not come close to justifying such a result.

Despite this Court's aversion to the concept of any after-the-fact approval of a credit extension of this type, it may still be worthwhile to conduct a brief analysis of the traditional factors that have been used before and after *Acevedo* to grant retroactive approval under such circumstances. Such analysis will demonstrate that, even when some courts may have been more willing to exercise greater discretion in *nunc pro tunc* type situations, the standards applied would not justify HESCO's suggested relief. When considering whether to grant retroactive approval, courts typically apply a three-part test:

> the court 1) is confident that it would have authorized the transaction if a timely application had been made; 2) is reasonably persuaded that the creditors have not been harmed; 3) takes into account, as bearing on the good faith of the debtor and lender, whether they honestly believed they had authority to enter the transaction without court approval.

*In re Nilhan Devs.,* 620 B.R. at 403 (citing *In re Am. Cooler Co.*, 125 F.2d 496, 497 (2d Cir. 1942)); *see also In re Grand Valley Sport & Marine, Inc.,* 143 B.R. at 850.

First, given the strong opposition to the DIP Financing Motion and the unusual nature of the transaction in converting unsecured pre-petition debt into a super-priority administrative expense regardless of whether the estate received any payments from general contractors, the Court would not have granted the Motion had it been fully pursued by the Debtor. More importantly, the conversion of pre-petition debt not related to the lien waivers and the waiver of potentially substantial preference claims were terms that would likely have been non-starters with this Court even in the absence of so many objections.

Second, the proposed financing appeared detrimental to other creditors at the time the DIP Financing Motion was filed. HESCO would have been provided a super-priority administrative expense for $979,207.98 without a guaranteed infusion of that amount of cash into the bankruptcy estate. To the extent HESCO has shown that general contractors did in fact pay the estate on invoices as to which HESCO waived its liens, the estate benefited. However, that could not have been known at the time of the lien waivers. For example, the Debtor was not paid after it abandoned projects in December. Had the Debtor abandoned any projects soon after the lien waivers were executed, the Debtor would not have received any benefit from the lien waivers for those projects. Even now, HESCO has not shown that the Debtor has been paid by general contractors for the full amount of proposed financing. Creditors would be harmed if the Court granted HESCO an administrative expense when the estate has not received an equivalent amount of benefit.

The third factor is absent under these facts. The parties knew from the beginning that their lien waiver / promissory note deal was subject to bankruptcy court approval. HESCO executed lien waivers at least two months before the parties finished papering the deal and sought court approval. HESCO did so at its own risk.

Retroactive approval is equitable relief. The general equities do not weigh in favor of the Court granting retroactive approval. The parties began with simple

terms for their deal: HESCO would waive its liens related to specific pre-petition invoices, and the Debtor would sign a promissory note for the invoice amounts which would be paid over a longer period than the Debtor's typical credit terms. Even at that point, they knew the deal would need Court approval, but HESCO provided its consideration with the lien waivers prior to the parties finalizing the deal. After HESCO provided its consideration, the parties negotiated the deal for two months and HESCO added to its demands for the deal. Ultimately HESCO withdrew from the deal prior to the Court approving it. HESCO provided the lien waivers and withdrew from the financing deal at its own risk and peril.

Both parties are sophisticated business entities and were represented by counsel in the proposed transaction. The Debtor did not mislead or misinform HESCO, nor did the Debtor back out of the transaction after promising to pursue the transaction and bankruptcy court approval. The Debtor only withdrew its motion for approval of the transaction after HESCO withdrew from the deal. HESCO has not presented any evidence of "unclean hands" or bad faith dealing by the Debtor.

There may be an appearance of inequity to the extent the Debtor received some benefit from HESCO waiving liens against third parties' property, but given the good faith dealing by the parties, HESCO's awareness of the need for court approval, and HESCO's representation by counsel, the Court does not find that, to the extent there is an equitable component, the balance of equities weighs in HESCO's favor. HESCO jumped the gun in executing lien releases prior to fully negotiating terms with the Debtor and prior to obtaining court approval of the proposed transaction.[10] HESCO apparently believed it had other options for payment if the deal fell through (*e.g.*, through reinstatement of its lien rights or payment by sureties). That those options did not materialize is not cause to elevate HESCO's prepetition claim to a higher priority administrative expense claim at the expense of other creditors.

---

[10] The Debtor did prepare the lien waivers and request that HESCO sign them, but the Debtor did not pressure HESCO to sign or place HESCO under duress. HESCO signed voluntarily and with knowledge of the risk.

To the extent the Court has the discretion to retroactively approve the transaction, the circumstances do not warrant it. Therefore, HESCO will not be granted an administrative expense claim based on § 364(b).

However, HESCO seeks allowance under § 503(b)(1)(A) without regard to § 364(b), so the Court will separately consider whether that relief is available and appropriate.

**3. Administrative Expense Under § 503(b)(1)(A) for Unapproved Financing**

The Debtor argues that the failure to obtain approval of non-ordinary course post-petition financing, which is required for an administrative claim pursuant to § 364(b), ends the discussion as to HESCO's entitlement to an administrative expense. Its argument is based on the canon of statutory construction that "a specific provision applying with particularity to a matter should govern over a more general provision encompassing that same matter," which applies to the Bankruptcy Code. *See Hughes v. Canadian Nat'l Ry. Co.*, 105 F.4th 1060, 1067 (8th Cir. 2024). Thus, the Debtor argues that the specific requirements for administrative expense treatment of non-ordinary course post-petition financing under § 364(b) govern over the general provision of § 503(b)(1)(A) for the "actual, necessary costs and expenses of preserving the estate."

HESCO disregards the implications of failure to obtain approval under § 364(b) and relies instead on general Sixth Circuit case law for the standards for granting administrative expense treatment under § 503(b)(1)(A). HESCO has not cited any authority for the court approving administrative expense treatment under § 503(b)(1)(A) related to unapproved, non-ordinary course, post-petition financing.

Most courts that have addressed the issue of whether to allow an administrative expense under § 503(b)(1)(A) or other subsections of § 503(b) when post-petition financing was not approved by the court express an unwillingness or reluctance to do so. *See, e.g., McKinstry v B & H Contractors, LLC* (*In re GC London KY, Inc.*), 575 B.R. 755 (Bankr. E.D. Ky 2017) (denying retroactive approval of non-

ordinary course loan and denying administrative expense priority under § 503(b)(1)(A) based on the lack of approval under § 364(d), insufficient showing that loan was made to preserve the debtor's estate, and lack of clarity about who made the loan); *In re Massetti*, 95 B.R. 360 (Bankr. E.D. Penn. 1989) (opining that to ignore § 364 and instead apply § 503(b)(1) in considering administrative expense treatment of a non-ordinary course loan would be to "overlook the clear language of a specific code provision as well as the purpose behind § 503(b)(1)"); *accord In re Ockerlund Const. Co.*, 308 B.R. 325 (Bankr. N.D. Ill. 2004) (holding that a loan made outside the ordinary course and without prior court approval could not be approved retroactively and was not even entitled to general unsecured status). *But see In re Reilly*, 542 B.R. 317 (Bankr. W.D.N.Y. 2015) (denying retroactive approval to non-ordinary course loan under § 364, but allowing an administrative expense under § 503(b)(1) based on general equitable grounds, including that the court likely would have authorized the loan had pre-approval been sought); *In re Nilhan Dev., LLC*, 620 B.R. 385 (denying retroactive approval and administrative expense priority to non-ordinary course loan under § 364(b) and § 503(b)(1), but denying § 503(b)(3) substantial contribution claims not based on the contribution being an unapproved loan, but based on lack of standing). There does not appear to be any persuasive authority in support of HESCO's position, and HESCO has cited none.

This Court finds a great deal of logic in the Debtor's argument that the specific post-petition financing provision in § 364(b) prevails over the more generic provision under § 503(b)(1)(A). However, it is unnecessary to conclude that this approach is dispositive in this case since an analysis under § 503(b)(1)(A) has the same outcome.

**a. No Transaction with the Estate**

For the reasons described above with respect to the failed, unapproved financing, HESCO did not have an enforceable post-petition agreement with the Debtor. HESCO did waive its liens at the Debtor's request after the petition date. However, that request was part of a broader transaction to include a promissory note that was never signed by the Debtor and never approved by the Court.

At the heart of HESCO's claim is the effort at converting pre-petition debt into post-petition administrative priority. The Sixth Circuit rejected the post-petition amendment of a pre-petition contract that would have converted pre-petition debt into an administrative expense priority in *In re White Motor Corp.*, 831 F.2d 106, 112 (6th Cir. 1987). The Circuit denied equitable relief relating to post-petition services on the pre-petition contract, because it "would unjustifiably elevate [the debt] over other creditors who are similarly situated." *Id.* (stating that the "fundamental principle underlying the Bankruptcy Code is that all creditors should be treated equitably and no creditor should receive a distribution disproportionately greater than that received by other members of its class").

"[I]t is an absolute requirement for administrative expense priority that the liability at issue arise post-petition." *Sunarhauserman*, 126 F.3d at 817. The Debtor's liability related to the pre-petition invoices arose prior to the petition date. HESCO's release of its lien rights against third parties' properties occurred at the Debtor's request post-petition. However, the lien waivers alone did not create any corresponding liability for the estate that did not already exist as of the petition date. The only way that the Debtor would have any liability related to the lien waivers would be if the Court approved the parties' proposed transaction to convert the pre-petition debt into a long-term promissory note pursuant to § 364(b). Without that approval, the lien waivers did not create any corresponding and distinct liability for the estate. Indeed, the liens involved property of third parties, not property of the Debtor.

Typically, for § 503(b)(1)(A) claims, the claimant has provided goods or services after the petition date, and the court must examine whether the pre-petition debtor or the debtor in possession induced the creditor "to part with its goods or services." *United Trucking Serv., Inc.*, 851 F.2d at 162. The substance of the transaction – the provision of goods or services – creates the liability. The "inducement" is only

relevant to determine whether the transaction is with the pre-petition debtor or the debtor in possession.[11]

HESCO would have the Court impose liability on the Debtor based on the Debtor's "inducement" of requesting that HESCO release its liens. The Sixth Circuit case law cited by HESCO does not support the use of § 503(b)(1)(A) to *impose* liability based on an inducement. Section 503(b)(1)(A) does not create liability. It only provides a mechanism for prioritizing existing liabilities.

The Court finds that, based on the particular facts of this case, there was no actual transaction with the bankruptcy estate merely by the Debtor accepting the benefit of HESCO granting lien waivers to third parties who were expected to pay the Debtor when the lien waivers were given.[12] HESCO chose to forego its rights against real property owned by third parties, but that did not change the pre-existing liability of the Debtor to HESCO. Therefore, it did not create the type of transaction with the post-petition estate that is required for § 503(b)(1) priority.

**b. Benefit to the Estate**

HESCO's claim for an administrative expense under § 503(b)(1)(A) rests heavily on this element, which alone does not justify administrative expense

[11] When the inducement comes from the debtor in possession, it can sometimes qualify as an administrative claim even if the transaction was initiated by the debtor. The Court has already addressed that situation in dealing with the post-petition deliveries of goods.

[12] If the Court denies administrative expense treatment relating to the lien waivers, HESCO included a request that, alternatively, the Court "declare void and unenforceable any $0 lien waivers that HESCO executed in reliance upon the Debtor's proposed Promissory Note and representations," and that such relief be *nunc pro tunc* to the date of execution. (Doc. No. 415, pp. 18-21.) HESCO cited no authority in support of its alternative claim other than an argument that it would constitute an unjust enrichment for estate to retain the benefit of the lien waivers. (*Id.*) An undeveloped argument is waived, and the Court need not analyze it. *See Markel v. Comm'r of Soc. Sec.*, No. 13-11196, 2013 WL 5854467, at *3 (E.D. Mich. Oct. 30, 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to ... put flesh on its bones.") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)). Notably, HESCO's argument contains obvious flaws that HESCO has not addressed: (i) that HESCO's lien waivers were as against the property of the project owners, who are not parties to this contested matter; (ii) a "proceeding to determine the validity, priority, or extent of a lien" is required to be an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001(b); and (iii) the limitations on granting *nunc pro tunc* relief discussed *supra*, § IV.B.2.

treatment. The applicable test has two parts, and the Court has already determined that the lien waivers do not satisfy the transaction element. Notwithstanding that failure, the Court will analyze the "benefit to the estate" factor. HESCO argues that it did something to its detriment that benefited the estate.

Any benefit must be "direct and substantial." *Nat'l Union Fire Ins. Co.*, 606 F.3d at 837–38. A "speculative or potential benefit" will not qualify as an administrative expense. *In re HNRC Dissolution Co.*, 343 B.R. 839, 843 (Bankr. E.D. Ky. 2006), aff'd, 371 B.R. 210 (E.D. Ky. 2007), aff'd, 536 F.3d 683 (6th Cir. 2008) (citation omitted).

"The requirement that the benefit be 'direct and substantial' reflects the statutory intent that only those expenses which 'preserve' the estate be allowed as administrative expenses." *In re Cardinal Indus., Inc.*, 151 B.R. 833, 837 (Bankr. S.D. Ohio 1992).

HESCO calculates its claim amount of $1,145,921.07 by tallying all unpaid, pre-petition invoices. HESCO's claim is based on its purported loss, not on proven benefit to the estate. "The focal point of the allowance of a priority is to prevent unjust enrichment of the estate, not to compensate the creditor for its loss.... Thus, a court looks to the actual benefit to the estate and not the loss sustained by a creditor." *In re Globe Metallurgical, Inc.*, 312 B.R. 34, 40 (Bankr. S.D.N.Y. 2004), *quoted in In re HNRC Dissolution Co.*, 343 B.R. at 843.

HESCO argues that the full amount of its claim, $1,145,921.07, benefited the estate based on (i) the Debtor's statements in the DIP-Financing Motion that it anticipated the lien waivers would benefit the estate and (ii) Jake Bartram's testimony at the hearing that the Debtor did receive some payments of HESCO invoices that were included in the proposed promissory note and lien waivers. This speculative and generalized benefit proof is not "direct and substantial." *See In re HNRC Dissolution Co.*, 343 B.R. at 843.

HESCO's lien waivers provided a direct and substantial benefit to the estate only to the extent that the Debtor received payment from general contractors that otherwise would have been paid to HESCO but for the lien waiver. Unfortunately, HESCO has not tied any payment received by the Debtor to a pre-petition invoice included in its lien waivers.

In closing arguments, HESCO's counsel argued that HESCO had proven that the Debtor was paid $814,823.83 on projects for which HESCO had waived its liens, and counsel referred to demonstrative Exhibit 2053. This summary exhibit purports to list all post-petition payments that Bartram received on projects with lien waivers, totaling $1,898,448.97, and HESCO's outstanding pre-petition invoices for those projects, totaling $814,823.83.[13] However, the invoices do not directly correlate to payments.

Taking the Clari Park project as an example, HESCO claims the evidence supports that Bartram was paid $49,193.74 post-petition. Assuming that is the case, and even assuming that payment was on account of a HESCO invoice in an equivalent amount, which has not been shown, the "benefit" to the estate would be $49,193.74. However, HESCO has included in its $814,823.83 calculation, $341,852.38 for Clari Park "lien waivers". (Ex. 2053.)

In HESCO's August 28, 2026, post-argument filing calculating various categories of evidence (Doc. No. 483), HESCO claims to have $387,877.63 in unpaid invoices, and that the Debtor was paid $308,154.49, relating to Clari Park. (Doc. No. 483, p. 15; Ex. B, p. 5.) HESCO claims these numbers are supported by "HESCO payment financials at HESCO 00182 and HESCO 00268-002326; MRO 10.31.25 (Dkt. 118); Bartram 002004." As previously noted, the Monthly Operating Reports were

[13] HESCO identifies this line as "HESCO lien waivers," but as noted *supra*, HESCO has included all pre-petition invoices in its claim regardless of whether an invoice was intended to be included in a lien waiver.

not introduced into evidence during trial, which excludes Doc. 118.[14] HESCO does not reference Exhibit numbers, only Bates numbers. Using the Bates numbers and with a fair amount of effort, the Court has identified some of the applicable exhibits. HESCO 00182 could not be found among the admitted exhibits. In case "00182" contains a typographical error, the Court looked at similarly numbered pages. HESCO 001082 and 001182 are part of Ex. 2016, but do not appear to relate to the Clari Park project. Since HESCO did not point to an actual exhibit number, and since the Court could not find "HESCO 00182," HESCO has failed to meet its burden as it relates to that part of its claim. The Court was able to find that HESCO 002[2]68 – 002326 is Exhibit 2026, and Bartram 002004 is part of Ex. 3030. Bartram 002004 is a check dated December 18, 2025, from RG Anderson to Bartram in the amount of $49,193.74, with reference to "3505-Final Pmt." The Court cannot tie this check to any of the 58 pages of Exhibit 2026 or otherwise determine that the $49,193.74 included payment of any HESCO invoice. Simply because the Debtor was paid on a project does not mean that it was paid for the products supplied by HESCO in the absence of more concrete proof making the connection. The Debtor would have billed general contractors for its own and all of its subcontractors' materials and labor in a given month.

The Court is unwilling to engage in this laborious process for each project identified in HESCO's post-argument filing, when no factual finding relating to benefit to the estate could be drawn from the Clari Park example. HESCO's demonstration of the proof may accurately list payments received by the Debtor and invoices included in HESCO's lien waiver, but this evidence is not probative because it is missing a key piece of the puzzle.

HESCO relied on generalized proof at trial, and when it became apparent that Bartram challenged the sufficiency of the generalized proof, HESCO has attempted to point to evidence in the record that the Debtor received payments post-petition on

---

[14] Even if considered, the Monthly Operating Report only shows that the Debtor received a payment of $258,960.75 from RG Anderson. HESCO has not pointed the Court to any evidence that the $258,960.75 payment included payment of any HESCO invoices.

projects for which HESCO waived liens as to pre-petition invoices. Without tying the particular payments to specific HESCO invoices, HESCO cannot show any direct and substantial benefit resulting from its lien waivers.

The Court's effort at connecting the dots between HESCO invoices and payments received by the Debtor was an attempt to ascertain the extent to which HESCO could theoretically have a valid administrative claim if it met the other requirements. Ultimately, it became apparent that HESCO failed to meet its burden in showing by a preponderance of the evidence exactly what dollar amount of benefit the Debtor did receive. Perhaps this effort was an unnecessary exercise since the Court has determined that other requirements were also unmet by HESCO.

**c. Unjust Enrichment**

HESCO argues that an unjust enrichment standard should apply to the extent the Court does not find that there was a post-petition transaction. At the Debtor's request, HESCO relinquished lien rights to its detriment, and HESCO argues that the Debtor was unjustly enriched by receiving payments from general contractors that would otherwise have been paid to HESCO to release its lien rights. It is somewhat unclear whether HESCO is contending that a different and looser standard should be applied under § 503(b)(1) when this equitable argument is made or if it is simply insisting that the Court should use its equitable powers to recognize an exception to the normal rules to assure the Debtor does not receive a windfall. Regardless, the limited cases that recognize unjust enrichment as a basis for an administrative claim do not support imposition of that relief under these circumstances.

HESCO cites *In re United Trucking Serv., Inc.*, in support of its unjust enrichment claim. 851 F.2d 159. "Unjust enrichment" is not an independent basis for allowing an administrative expense claim. In *United Trucking*, the debtor in possession retained and did not maintain trailers that the debtor leased pursuant to a pre-petition lease. *Id.* at 160-61. The debtor in possession did not induce the creditor to do anything after the petition date. In fact, the creditor sought to compel

the debtor to assume or reject the lease, asserting concerns about the condition of the trailers, and the debtor retained possession of the trailers over the creditor's objection. *Id.* The debtor did not present all trailers for inspection when ordered to do so. *Id.* at 161. When an order of default triggered rejection, the debtor returned all but two trailers, and the returned trailers were in poor condition, not having been maintained in good repair as required by the lease. *Id.* Because the debtor in possession did not induce the creditor to allow the debtor to retain the trailers after the petition date and the creditor fought against such retention, the claim did not fit neatly within the post-petition transaction requirement for administrative expense treatment under § 503(b)(1).

The Sixth Circuit followed Second Circuit rationale that

> [t]he right to priority in the event the trustee or debtor in possession receives benefits under the [executory] contract during the interval between the filing of the debtor's petition and the rejection of the contract "is an equitable right based upon the reasonable value" of the benefits conferred, rather than upon the contract price.
>
> ....
>
> ... [T]he purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him.

*Id.* at 162 (quoting *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2d Cir. 1960)). The Sixth Circuit affirmed the bankruptcy court's holding that the debtor's misuse of the trailers and breach of the repair provisions of the pre-petition lease benefited the bankruptcy estate because the money it saved in not performing repairs was available for use in the debtor's operations. *Id.*

In *United Trucking*, the debtor's wrongful conduct benefited the estate. The Court agrees with those cases limiting *United Trucking* to similarly egregious facts. *See, e.g., In re Cardinal Indus. Inc.*, 142 B.R. at 805 (opining that "*United Trucking* should be limited to fact patterns of a similarly egregious nature"); *In re James River Coal Co.*, No. 306-0411, 2006 WL 2548456, at *5 (M.D. Tenn. Aug. 31, 2006)

(distinguishing *United Trucking* from the case before it where there was "no actual value conferred on the estate post-petition and no wrongful act on the part of the debtor").

As previously discussed, the Debtor did not act wrongfully in requesting the lien waivers. The Debtor negotiated in good faith with HESCO and sought Court approval of the proposed financing deal until HESCO withdrew from the transaction. As cases interpreting *United Trucking* have stated, conduct of the Debtor that would justify imposing an administrative claim would need to rise to the level of being "egregious." To the extent the estate was "enriched" in this particular case, it was not unjustly so. HESCO knew that Court approval was required, but, with eyes wide open, it signed the lien waivers and then did not fully pursue Court approval.

#### d. Summary

Even if the lien waivers benefited the estate, the Court cannot allow HESCO an administrative expense for that benefit because HESCO has failed to prove that the lien waivers were part of an enforceable transaction with the debtor in possession. Likewise, an exception is not warranted based on the unjust enrichment argument. HESCO's claim for administrative expense treatment of its lien waivers pursuant to § 503(b)(1)(A) is denied.

## V. CONCLUSION

HESCO is allowed an administrative expense claim under § 503(b)(9) in the amount of $141.91 and § 503(b)(1)(A) in the amount of $404,144.86.

With regard to the related request by HESCO that it be paid its administrative claim on the effective date of the plan, the facts do not necessarily warrant that treatment as to the full amount allowed. A few invoices are within the 60-day contract terms, and there is no basis to require the Debtor to accelerate those payments. Also, to the extent any invoices relate to on-going projects in connection with which HESCO has agreed to be paid through joint checks payable to both the

Debtor and HESCO, HESCO has agreed to alternative payment terms and is not entitled to payment in full of those amounts on the Effective Date of the Debtor's plan of reorganization, should it be confirmed. To the extent there are issues that have to be determined about what must be paid on the effective date of a plan and what can be paid based on contractual terms at a later date, those issues are reserved for the confirmation hearing.

HESCO was still being paid by general contractors or owners as of the trial, and it may receive payment from those third parties on one or more of the invoices included in its allowed administrative expense claim. To the extent HESCO receives payment from a third party on an invoice included in its allowed administrative expense claim, its claim against the bankruptcy estate shall be reduced by an equivalent amount.

If HESCO is paid by a third party after its administrative expense claim is paid by the Debtor, HESCO shall reimburse the Debtor the equivalent amount. The Court expects the parties to respect the Court's ruling and cooperate with the sharing of any information relating to ongoing payments, but if a dispute arises, either party may file an appropriate motion.

The Court will enter an appropriate order consistent with this opinion.

IT IS SO ORDERED.